IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | | |
|---|---|---|
| Thomas O'Grady, | ) | |
| | ) | |
| Plaintiff, | ) | CA No. 3:06-1021-HMH-JRM |
| | ) | |
| vs. | ) | **OPINION & ORDER** |
| | ) | |
| Michael J. Astrue, Commissioner of | ) | |
| Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

This matter is before the court with the Report and Recommendation of United States Magistrate Judge Joseph R. McCrorey, made in accordance with 28 U.S.C. § 636(b) and Local Civil Rule 73.02 of the District of South Carolina.[1]  Thomas O'Grady ("O'Grady") seeks judicial review of the Commissioner of Social Security's ("Commissioner") denial of his application for disability insurance benefits ("DIB") under Title II of the Social Security Act.  In his Report and Recommendation, Magistrate Judge McCrorey recommends reversing the Commissioner's decision and remanding the case pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings.  The Commissioner objects to the Report and Recommendation.  For the reasons stated below, the court adopts the Magistrate Judge's

---

[1] The recommendation has no presumptive weight, and the responsibility for making a final determination remains with the United States District Court.  See Mathews v. Weber, 423 U.S. 261 (1976).  The court is charged with making a de novo determination of those portions of the Report and Recommendation to which specific objection is made.  The court may accept, reject, or modify, in whole or in part, the recommendation made by the Magistrate Judge or recommit the matter with instructions.  See 28 U.S.C. § 636(b)(1) (2006).

1

Report and Recommendation and reverses the Commissioner's decision and remands the case pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The facts are fully set forth in the decision of the administrative law judge ("ALJ"), (R. at 27-37), and summarized as follows. At the time of the ALJ's decision on April 28, 2005, O'Grady was a sixty-year-old man with a high-school education. (Id. at 22, 277.) His past relevant employment includes work as a sales representative. (Id. at 28.) Initially, O'Grady alleged that his disability began in July 1994. However, O'Grady amended this date and alleges that he has been disabled since December 15, 1997, due to organic brain syndrome ("OBS"), depression, attention deficit disorder, a lumbar spine disorder, hypertension, reactive airway disease, and strokes. (Id. at 28, 85.)

On October 30, 2002, O'Grady filed an application for DIB. (Id. at 80-83.) The application was denied initially and on reconsideration. (R. at 24-25, 105-10.) After a hearing held January 18, 2005, the ALJ issued a decision dated April 28, 2005, denying benefits. (Id. at 27-37.) On January 31, 2006, the Appeals Council denied O'Grady's request for review. (Id. at 7-9.) O'Grady filed the instant action on April 14, 2006.

O'Grady almost drowned in a scuba diving accident in July 1991. Because a cerebral gas embolism could not be ruled out, O'Grady was recompressed with adjunctive measures. (Id. at 117.) On April 2, 1994, O'Grady reported to Dr. Michael Gingras ("Dr. Gingras"), a psychiatrist, that he was suffering from depression, anxiety, poor sleep, lack of concentration, dizziness, and feelings of panic. Dr. Gingras observed that O'Grady was tense, shaky, and unsure of himself, and that O'Grady's cognition was affected due to poor memory and

concentration. Dr. Gingras diagnosed Plaintiff with post-concussion syndrome and an adjustment disorder with mixed emotional features including generalized anxiety and panic and moderately-severe depression. Dr. Gingras prescribed Xanax for O'Grady. (Id. at 237-38.) On May 2, 1994, Dr. Gingras noted that Plaintiff's condition remained the same and diagnosed O'Grady with organic brain syndrome ("OBS"). (R. 235-36.) Dr. Gingras prescibed Zoloft for O'Grady on May 5, 1994. (Id. at 234.) Dr. Gingras noted some improvement in O'Grady's depression on May 12, 1994. (Id. at 233.) On June 29, 2004, Dr. Gingras noted that O'Grady was experiencing oversensitivity and anxiety. (Id. at 232.) At O'Grady's next appointment in August 1994, Dr. Gingras reported that O'Grady was doing well and that his assessment of O'Grady was the same. (Id. at 231.) On September 19, 1994, Dr. Gingras reported that O'Grady was tense and had some difficulty sleeping and prescribed Zoloft, Ambien, and Xanax for O'Grady. (R. at 230.) At his November 1994 appointment, O'Grady reported that he had lost his job and was struggling with issues related to a motor vehicle accident. (Id. at 229.)

On October 12, 1994, Dr. Robert Martinez ("Dr. Martinez"), a neurologist, examined O'Grady and noted that O'Grady had memory difficulties, trouble concentrating, a shortened attention span, and marked short-term memory loss since the 1991 scuba diving accident. (Id. at 134.) O'Grady indicated that he was disoriented at times and that his intellectual ability was decreased. Based on his examination of O'Grady, Dr. Martinez noted that O'Grady "was a little bit dull . . . . [and] slow to respond. He was not quite as sharp as he should be." (Id. at 135.) Dr. Martinez's impression was that O'Grady suffered from "chronic [OBS] secondary to hypoxic encephalopathy as a result of a near drowning episode" in 1991. (Id. at 137.)

3

Further, Dr. Martinez concluded that O'Grady had reached maximal medical improvement, that his OBS was permanent with a "22% permanent partial disability rating to the body as a whole," and that O'Grady would need long-term psychiatric care. (R. at 137.)

O'Grady saw Dr. Gingras on January 17, 1995, July 12, 1995, August 25, 1995, and November 21, 1995. During this time, O'Grady reported increased stress and no energy. Further, in August 1995, Dr. Gingras noted that O'Grady was not tolerating his medications. Dr. Gingras prescribed Paxil. According to Dr. Gingras's November 1995 office note, O'Grady responded well to Paxil. (Id. at 225-38.)

O'Grady continued to see Dr. Gingras throughout 1996. Dr. Gingras noted that O'Grady continued to suffer from stress and tension. In particular, O'Grady attempted to work in September 1996 and was experiencing increasing stress and lack of sleep. (Id. at 221-22.) On December 23, 1996, Dr. Gingras noted that "to this date very little progress has been accomplished since many of these symptoms are organically based and therefore possibly permanent. It is more than likely that his ability to perform on a cognitive level remains inadequate and will probably remain the same with a very poor prognosis." (Id. at 219.)

O'Grady suffered a back injury in a motor vehicle accident on June 19, 1996. On September 30, 1996, Dr. James Schwartz ("Dr. Schwartz"), an orthopaedist, diagnosed O'Grady with "severe degenerative disk disease at L5, S1, with apparently an extruded disk," a cervical strain, and mild degenerative disk disease. (Id. at 138.) Dr. Schwartz recommended chiropractic treatment, anti-inflammatory medication, and muscle relaxers. Further, Dr. Schwartz told O'Grady to "hold off for at least another 60 days" before beginning a job that would require several hours a day of driving. (R. 139.)

On September 29, 1997, and December 10, 1997, Dr. Gingras reported that O'Grady was doing well, but was under stress from his back injury and job. Dr. Gingras noted that his assessment of O'Grady remained the same. (Id. at 217-18.)

Dr. Richard McAdam ("Dr. McAdam"), a neurosurgeon, examined O'Grady on January 30, 1998, and noted that O'Grady's back pain made driving difficult. Dr. McAdam recommended epidural steroid injections for O'Grady's back pain. (Id. at 149-150.) O'Grady received steroid injections in January 1999, August 1999, and January 2000. (Id. at 140-42.)

O'Grady saw Dr. Gingras on January 12, 1999, June 17, 1999, August 26, 1999, and November 18, 1999. In January 1999, Dr. Gingras found that O'Grady was "not capable of functioning in the job because of numerous family problems. The patient is reporting being depressed, feeling his medication is not working as well as it did before and having run out." (Id. at 212.) However, Dr. Gingras noted that O'Grady was in a good mood and highly motivated for treatment. In June, August, and November 1999, Dr. Gingras reported that O'Grady was doing relatively well considering the amount of stress in his life. (R. at 209-11.)

On March 1, 2000, Dr. McAdam noted that the injections had only provided temporary relief and on March 24, 2000, recommended that O'Grady continue with the injections and consider surgery if his pain continued. (Id. at 145.) A March 22, 2000, MRI revealed degenerative disk disease at L4-5 and L5-S1 and "an enlarged right lateral osteophyte at L5-S1, likely with an associated disk bulge." (Id. at 146-47.)

In January 2000, Dr. Gingras reported that O'Grady was doing relatively well but was suffering from "mild cognitive impairment as evidenced by his inability to focus and retain short term memory content." (Id. at 208.) In March 2000, O'Grady reported that he had

5

ceased to take Ambien and Xanax, but was taking Celexa and Ritalin. Dr. Gingras noted that he was doing relatively well. (Id. at 207.) Dr. Gingras's notes reveal that O'Grady continued to do relatively well from 2000 to early 2002. Dr. Gingras noted on May 29, 2002, that O'Grady was crying during the interview and reported that he was feeling depressed and suffering from cognitive issues. (R. at 206.)

Another psychiatrist, Dr. Joseph Cockrell ("Dr. Cockrell"), examined O'Grady on March 5, 2001, for O'Grady's depression and excessive irritability. Dr. Cockrell prescribed Effexor. (Id. at 170.) On April 5, 2001, Dr. Cockrell noted that Effexor was not helping, and he switched O'Grady to Wellbutrin. (Id. at 169.) O'Grady reported improvement in his mood and energy. Dr. Cockrell noted that O'Grady's improvement might be due to "a cycling mood condition, such as bipolar disorder" because "it seems unlikely that Wellbutrin by itself would suddenly cure so many symptoms . . . ." (Id.) A May 7, 2002, cat scan revealed "two left cerebellar hemisphere lesions consistent with old infarcts." (Id. at 153.)

In July 2003, O'Grady considered electroconvulsive therapy but was afraid of following through with treatment. (R. at 186, 189.)

On January 24, 2003, a state agency physician reviewed O'Grady's medical records and concluded that

> as of December 31, 2001, O'Grady retained the physical residual functional capacity ("RFC") to lift fifty pounds occasionally and twenty-five pounds frequently; stand and/or walk and sit six hours in an eight-hour workday; perform limited lower extremity pushing and/or pulling; climb ramps and stairs; balance, stoop, kneel, crouch, and crawl frequently; perform work not requiring climbing ladders, ropes, and scaffolds; and perform work not requiring concentrated exposure to fumes, odors, dusts, gases, and poor ventilation. The physician noted no manipulative, visual, communicative, or other environmental limitations.

(Report and Recommendation 9-10; R. at 154-63.)

On October 23, 2003, Dr. Gingras completed a Mental Impairments Questionnaire. (R. at 199-204.) In the questionnaire, Dr. Gingras indicated that O'Grady had a reduced IQ and was not able to maintain an acceptable degree of functioning. (Id. at 202.) Further, Dr. Gingras found that O'Grady's ability to understand, remember, and carry out simple instructions; make simple work-related decisions; accept instructions; and respond appropriately to supervisors was limited, but satisfactory. (Id. at 201.) Dr. Gingras opined that O'Grady was unable to understand and remember detailed instructions. (Id. at 202.) Dr. Gingras also noted that O'Grady suffered from marked limitations in maintaining social functioning, concentration, persistence, or pace. (Id. at 203.) Dr. Gingras indicated that O'Grady experienced four or more "repeated episodes of decompensation within a twelve month period, each of at least two weeks in duration." (R. at 203.) Dr. Gingras concluded that O'Grady's condition was organically based and that no improvement could be expected. (Id.) On February 2, 2004, Dr. Gingras noted that O'Grady continued to suffer from decreased focus and organizational skills. (Id. at 198.)

## II. REPORT AND RECOMMENDATION

In his brief to the Magistrate Judge, O'Grady argued that the ALJ erred in the following ways: "(1) improperly weighed the opinion of Plaintiff's treating physician; (2) conducted a flawed credibility analysis; (3) failed to perform a 'function-by-function' assessment in determining Plaintiff's RFC; and (4) erroneously concluded that Plaintiff possessed transferable skills." (Pl.'s Br., generally.)

The Magistrate Judge found that the ALJ (1) failed to properly consider Dr. Michael Gingras's ("Dr. Gingras") "October 2003 opinion in light of all of the evidence;" and (2) failed to properly consider O'Grady's credibility and complaints of pain. The Magistrate Judge found that any error with respect to transferability of skills was harmless. Accordingly, the Magistrate Judge recommended reversing the Commissioner's decision and remanding this action "to the Commissioner to properly consider the opinion of Plaintiff's treating physician (Dr. Gingras), determine Plaintiff's RFC, and evaluate Plaintiff's credibility." (Report and Recommendation 15.)

### III. DISCUSSION OF THE LAW

#### A. Standard of Review

Under 42 U.S.C. § 405(g), the court may only review whether the Commissioner's decision is supported by substantial evidence and whether the correct law was applied. See Myers v. Califano, 611 F.2d 980, 982 (4th Cir. 1980). In other words, the court "must uphold the factual findings of the [Commissioner only] if they are supported by substantial evidence *and* were reached through application of the correct legal standard." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996) (emphasis added).

"A factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987). "Substantial evidence" is defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990) (internal quotation marks omitted). Hence, if the Commissioner's finding is supported

by substantial evidence, the court should uphold the Commissioner's finding even if the court disagrees with it. See id.

### B. Objections

First, the Commissioner objects to the Magistrate Judge's conclusion that the ALJ improperly assessed Dr. Gingras's opinion. (Objections 1, 3.) Second, the Commissioner objects to the Magistrate Judge's finding that the ALJ failed to properly evaluated O'Grady's credibility. (Id. 4.)

#### 1. Dr. Gingras's Opinion

The Magistrate Judge found that the ALJ did not properly consider Dr. Gringas's October 2003 report. The Commissioner objects that "the October 2003 assessment upon which Plaintiff relied is well past the December 31, 2001 expiration of his insured status, and it did not purport to be retrospective. Thus, it is irrelevant to his condition during the relevant time period." (Objections 1.) This argument is without merit. Dr. Gingras diagnosed O'Grady with OBS in 1994. (R. at 235-36.) In his October 2003 report, Dr. Gingras stated that O'Grady's condition was organically based and that no improvement was expected. (Id. 203.) Since Dr. Gingras diagnosed O'Grady with OBS, Dr. Gingras repeatedly stated in his office notes that his assessment of O'Grady has remained the same. Many of O'Grady's problems relate to his OBS. Therefore, Dr. Gingras's October 2003 report is relevant to evaluating O'Grady's condition from December 15, 1997, until December 31, 2002.

In addition, the Commissioner argues that Dr. Martinez's opinion is not relevant because it was made prior to O'Grady's alleged onset date. The court disagrees. Dr. Martinez noted that O'Grady had a 22% permanent partial disability rating to the whole body from OBS.

9

Despite the fact that Dr. Martinez's evaluation was made before the alleged onset date, it is wholly relevant given that Dr. Martinez found that the partial disability from the OBS was permanent. (Id. at 135-37.) Based on the foregoing, the Commissioner's objections concerning the relevancy of Dr. Gingras's October 2003 report and Dr. Martinez's opinion are without merit.

Further, the court finds that the ALJ failed to properly consider Dr. Gingras's October 2003 report. Under the treating physician rule, "a treating physician's opinion on the nature and severity of the claimed impairment is entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record." Mastro v. Apfel, 270 F.3d 171, 178 (4th Cir. 2001). The Magistrate Judge found that the "ALJ appears to have ignored Plaintiff's diagnosis of OBS. Many of the limitations outlined by Dr. Gingras [in his October 2003 report] appear to relate to [his OBS], which resulted from Plaintiff's head trauma and decreased oxygen supply in 1991." (Report and Recommendation 12.)

Dr. Gingras's October 2003 report noted that O'Grady had a reduced IQ and was "unable to maintain an intellectually acceptable degree of functioning." (R. at 202.) Further, Dr. Gingras found that O'Grady's ability to understand, remember, and carry out simple instructions; make simple work-related decisions; accept instructions; and respond appropriately to supervisors was limited, but satisfactory. (Id. at 201.) However, Dr. Gingras opined that O'Grady was unable to follow detailed instructions. Dr. Gingras also noted that O'Grady suffered from marked limitations in maintaining social functioning, concentration, persistence, and pace. (Id. at 203.) Dr. Gingras indicated that O'Grady had four or more

10

periods of "repeated episodes of decompensation within a twelve month period, each of at least two weeks in duration."  (Id.)  Dr. Gingras concluded that O'Grady's condition was organically based and that no improvement could be expected.  (Id.)

The ALJ did "not accord controlling weight to the opinion of Dr. Gingras because his "own office notes do not reflect such severe limitations and are inconsistent with his October 24, 2003, submission."  (R. at 33.)  The ALJ stated as follows in his decision:

> He has not treated the claimant since 2002.  In April 1994[,] Dr. Gingras began treating the claimant, and by August 1994 he noted that the claimant was doing well.  In December 1996 he noted that the claimant was looking for a job.  Dr. Gingras saw the claimant on April 8, 1998, and May 28, 1998, and he noted that the claimant felt his concentration had improved.  Dr. Gingras wrote that the claimant was "very active on the job."  On January 12, 1999, the claimant was in a good mood, had moved down to South Carolina and was now taking care of his in-laws.  He was in a good mood, and he was not depressed. He was not suicidal or homicidal.  His judgment was well preserved.  His insight was good, and he was highly motivated for treatment.  On June 17, 1999, the claimant reported that he was doing relatively well despite numerous family stressors.  On August 26, 1999, he was still in a good mood and was dealing with stress adequately.  On November 18, 1999, he reported that he was doing quite well despite his ongoing situation.  He wished to continue with Paxil.  On January 20, 2000, the claimant reported that he was still trying to find himself a decent job. His mood was not depressed and his morale was good.  On May 24, 2000, December 11, 2000, and December 21, 2000, the doctor reported that the claimant was doing well.  On July 27, 1998, Dr. Gingras described the claimant as articulate, intelligent, and motivated for treatment.

(Id.)

First, the ALJ incorrectly stated that Dr. Gingras has not treated O'Grady since 2002, but Dr. Gingras in fact treated O'Grady in 2004.  (Id. at 198.)  In addition, after review of the ALJ's decision, the court finds that the ALJ failed to consider O'Grady's diagnosis of OBS in rendering his decision.  In a disability case, "[o]bjective medical facts and the opinions and diagnoses of the treating and examining doctors constitute a major part of the proof to be

11

considered in a disability case and may not be discounted by the ALJ." McLain v. Schweiker, 715 F.2d 866, 869 (4th Cir. 1983). In his decision, the ALJ states that "the medical evidence indicates that prior to the date he was last insured for disability benefits, December 31, 2001, the claimant had diagnoses of degenerative disk disease and depression, impairments that are 'severe' within the meaning of the regulations but not 'severe' enough to meet or medically equal, either singly or in combination to one of the impairments listed in Appendix 1 Subpart P, Regulations No. 4." (R. at 31.) However, this is incorrect as O'Grady was diagnosed with OBS in 1994. (Id. at 235-36.)

Further, as the Magistrate Judge noted, the ALJ considered Dr. Gingras's references that O'Grady was doing well, but failed to consider Dr. Gingras's repeated assessment that O'Grady's condition remained the same and that O'Grady experienced varying problems throughout this time period, which required numerous medication adjustments. Moreover, the ALJ failed to consider Dr. Martinez's opinion in determining what weight to afford Dr. Gingras's opinion. Dr. Martinez opined that O'Grady had a 22% permanent partial disability rating to the whole body from OBS, which is consistent with Dr. Gingras's October 2003 opinion. (Id. at 135-37.) Based on the foregoing, the court finds that the ALJ failed to properly consider Dr. Gingras's October 2003 opinion and O'Grady's residual functional capacity based on all of his impairments.

### 2. O'Grady's Credibility

The Commissioner objects to the Magistrate Judge's conclusion that the ALJ failed to properly evaluate O'Grady's credibility. Subjective complaints of pain are evaluated under the test articulated in Craig, 76 F.3d at 594-95. "[T]he determination of whether a person is

disabled by pain or other symptoms is a two-step process." Id. at 594. "First, there must be objective medical evidence showing the existence of a medical impairment(s) which results from anatomical, physiological, or psychological abnormalities and *which could reasonably be expected to produce the pain or other symptoms alleged*." Id. (internal quotation marks omitted). The ALJ must "expressly consider the threshold question of whether [O'Grady] . . . demonstrated by objective medical evidence an impairment capable of causing the degree and type of pain []he alleges." Id. at 596. After a claimant has met the threshold showing of a medical impairment likely to cause pain, "the intensity and persistence of the claimant's pain, and the extent to which it affects h[is] ability to work, must be evaluated." Id. at 595. In making these determinations,

> [i]t is not sufficient for the adjudicator to make a single, conclusory statement that the "individual's allegations have been considered" or that "the allegations are (or are not) credible." It is also not enough for the adjudicator simply to recite the factors that are described in the regulations for evaluating symptoms. The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.

SSR 96-7p, 1996 WL 374186, at *2 (1996).

The Commissioner argues that the ALJ considered objective evidence in evaluating O'Grady's subjective complaints. In his decision, the ALJ stated:

> The claimant alleged low back pain and stated that he could not do anything around the house including yard work and playing with his son. However, an orthopedic evaluation in 1996 failed to show any significant clinical findings. He had minimal decrease of extension and lateral bending of the lumbar spine. Straight leg raising was negative. Deep tendon reflexes were 2+ and equal at the knees and ankles. Sensation to light touch was intact. Motor testing in the lower extremities was intact and symmetric.

> The testimony of the claimant is not fully credible concerning the severity of his symptoms and the extent of his limitations. Neither the severity nor the extent is supported by the objective medical evidence of record. . . .

(R. at 32.)

However, the "ALJ did not expressly consider the threshold question of whether [O'Grady] had demonstrated by objective medical evidence an impairment capable of causing the degree and type of pain []he alleges." Craig, 76 F.3d at 596. In his decision, the ALJ found that O'Grady suffered from two severe impairments, degenerative disc disease and depression. (R. at 31.)   Further, a March 22, 2000, MRI revealed degenerative disc disease at L4-5 and L5-S1 and an enlarged right lateral osteophyte at L5-S1 with a likely associated disc bulge. (Id. at 146-47.)  The ALJ plainly did not comply with the Craig test, and the Commissioner cited no case to ignore the Craig test.  Hence, the Commissioner's objection is without merit.  Based on the foregoing, the court adopts the Magistrate Judge's Report and Recommendation.  Therefore, this action is reversed and remanded to the ALJ to properly consider Dr. Gingras's October 2003 opinion in light of the evidence, determine O'Grady's RFC, and evaluate O'Grady's credibility.

Therefore, it is

**ORDERED** that the Commissioner's decision is reversed and the case is remanded pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings.

**IT IS SO ORDERED**.

s/Henry M. Herlong, Jr.
United States District Judge

Greenville, South Carolina
May 16, 2007